**In the Matter of the Supervised Administration of the ESTATE OF Stephen Craig COMPTON, Deceased,**

**Gregory D. Compton, Sara J. Compton, and Megan S. Compton, Appellants,**

v.

**First National Bank of Monterey, As Personal Representative of the Estate of Stephen Craig Compton, and Scott W. Compton and Angela F. Compton, Appellees.**

No. 66A03–0906–CV–249.

Court of Appeals of Indiana.

Jan. 19, 2010.

---

Donald J. Tribbett, Tribbett Law Office, George W. Stephenson, Michael & Stephenson, Logansport, IN, Attorneys for Appellants.

Daniel P. Murphy, Alan F. Hizer, Winamac, IN, Attorneys for Appellee First National Bank of Monterey, As Personal Representative of the Estate of Stephen Craig Compton.

Daniel S. Tankersley, Winamac, IN, Attorney for Appellee Scott W. Compton.

## OPINION

VAIDIK, Judge.

### Case Summary

In light of the 2005 amendment to Indiana Code section 30–5–9–2(b), the common law presumption of undue influence does not apply to a transaction where the principal takes action, the power of attorney is unused, and the attorney in fact benefits. Here, Stephen Craig Compton and his son Scott W. Compton, who also served as Stephen's attorney in fact, and Scott's wife Angela F. Compton en-

tered into contracts while Stephen was hospitalized shortly before his death. Because the evidence shows that Stephen took action, the power of attorney was unused, and Scott benefited from the transaction, the common law presumption of undue influence does not apply. Because the evidence shows that Stephen acted under his own free will in executing the contracts, we conclude that the trial court properly granted First National Bank of Monterey's petition for completion of those contracts.

### Facts and Procedural History

Stephen had six children, Richard, Scott, Gregory, Sara, Megan, and Misty, and a significant amount of farmland. Stephen executed a will on July 14, 2005, providing for his six children to varying degrees. According to Stephen's will, Gregory was to receive approximately 150 acres of his farmland. In addition to his will, Stephen executed a power of attorney on September 15, 2005, naming Scott his attorney in fact.

On January 15, 2008, Stephen was admitted to St. Joseph Hospital in Kokomo because of complications from end-stage renal disease. While in the hospital, Stephen executed a contract selling the 150 acres set aside for Gregory in his will to Scott and his wife Angela. Stephen also executed a contract purchasing Scott and Angela's house and an adjoining two acres and putting the house in Gregory's name. Stephen was released from the hospital on January 21. He died on February 12, 2008, at the age of sixty.

Stephen's will was admitted to probate in late February 2008. Monterey Bank was appointed personal representative. Thereafter, Monterey Bank filed an inventory and noted that the acreage set aside for Gregory in Stephen's 2005 will had been sold by contract to Scott and Angela in January 2008. However, the sale had not been completed because of Stephen's death. As such, in September 2008 Monterey Bank filed a petition for completion of contracts. The petition identified and attached two contracts purportedly entered into by Stephen on January 17, 2008. According to one contract, Stephen offered to purchase from Scott and Angela their house and an adjoining two acres for $135,000. A notarized addendum to this contract directed that the deed be placed in Gregory's name. According to the other contract, Scott and Angela offered to purchase from Stephen the approximate 150 acres of farmland for $381,801.60. Monterey Bank requested permission from the trial court "to complete the sale and purchase of property in accordance with the terms and conditions of the[ ] contracts." Appellants' App. p. 44.

In December 2008 three of Stephen's children, Gregory, Sara, and Megan (collectively, "the three complaining children"), filed an objection to Monterey Bank's petition for completion of contracts. In relevant part, the three complaining children argued that the contracts were "the result of undue influence." *Id.* at 53. A hearing was set for March 2009. Before the hearing, Scott requested special findings of fact and conclusions of law pursuant to Indiana Trial Rule 52, and Monterey Bank filed an updated inventory valuing the acreage at $606,600.00 (the May 2008 inventory valued it at $381,801.60). Following the hearing, the trial court issued an order on May 1, 2009. It provides in relevant part:

1. The issues of this case currently before the Court center upon the request of the personal representative for authority to complete two contracts for the sale and purchase of real estate purportedly made between the decedent and Scott W. Compton, his son, and Angela F. Compton, his daughter-in-law, supplemented by a notarized addendum.

5. Scott W. Compton, one of the parties to those purported contracts, identified the contracts and the signatures thereon as including those of the decedent.

6. The essence of the objection to that request, based on the hearing and arguments in writing, is that the makings of those contracts were the result of undue influence by Scott W. Compton over the decedent, essentially because of an allegation that Scott W. Compton forged the decedent's signatures on those purported contracts and the fact that Scott W. Compton was the attorney-in-fact of the decedent at the time of the making of the purported contracts.

7. Execution of those purported contracts were never denied under oath in any responsive pleading or by an affidavit filed therewith.

8. Sharon Rose Hampton testified that from her examination of the purported contracts, including the notarized addendum, the purported signatures of the decedent were in fact written by Scott W. Compton; however, Debbie L. Moriarity, a notary public, testified that she followed protocol and established that the person signing the addendum was identified by hospital records and a wrist band as the decedent, who understood what he was doing.

9. *Scott W. Compton never executed any documents or otherwise acted as an attorney-in-fact for the decedent,* but did directly participate in the preparation and execution of these purported contracts.

10. The purported contracts, if enforced, will alter the decedent's estate plan as set forth in his will as admitted to probate, will certainly have tax consequences, and could ultimately prove to be part gift if established by unknown litigation over values for tax purposes.

11. *The decedent, nevertheless, on numerous occasions within the relative time frame of these purported contracts, and after having made his will as probated, commented on working on real estate sales and trades, commented on changing his will, and inquired as to valuations, all independent of the presence of Scott W. Compton and without any evidence that his actions were being influenced by Scott W. Compton in any fashion.* He was observed as being rational in spite of being down in the dumps and knowing his days were numbered. He was characterized as one to make up his own mind, to do his own thing, knowing his own mind, being strong willed, and not subject to being bullied or pushed. He was aware of the financial and legal problems of one of his daughters and covered the expenses thereof. He did not like paying taxes and in fact was delinquent in his tax filings, but there was no evidence that he considered the tax ramifications of any part of his estate plan. He was aware [and] alert during his hospitalization. The purported contracts were consistent with his independent actions over numerous months prior to his hospitalization. He died shortly after his release from the hospital and prior to the completion of those purported contracts.

12. The decedent was one of those persons who, in the end, made disposition of some of his property though inter vivos transactions regardless of the consequences to the provisions of his estate plan created years before, acting under his own free will.

13. As jurors are instructed in will contests, "[a] person of sound mind and acting under his own free will has the right to ... dispose of property as he may choose, no matter how inequitable and unjust such a disposition may ap-

pear to others. The person's motives cannot be questioned."

14. By clear and convincing evidence, the decedent was not the subject of undue influence from Scott W. Compton and acted under his own free will in the making [of] those purported contracts; therefore, the personal representative should be authorized to complete the contracts as the contracts of the decedent.

*Id.* at 11–13 (emphases added). The three complaining children now appeal. Scott and Angela[1] (collectively, "Scott") and Monterey Bank respond with separate briefs.

## Discussion and Decision

The three complaining children contend that the trial court erred in granting Monterey Bank's petition for completion of the contracts entered into by their father Stephen while he was hospitalized shortly before his death. Specifically, they argue that the court erred in failing to apply the common law presumption of undue influence to the transactions entered into between Stephen and their brother Scott, whom their father appointed as his attorney in fact, and that when the presumption is properly applied, Scott failed to rebut it by clear and unequivocal proof. Scott and Monterey Bank respond that the 2005 amendment to Indiana Code section 30–5–9–2(b) abrogates the common law presumption of undue influence to transactions such as these, where the principal takes action, the power of attorney is unused, and the attorney in fact benefits. Thus, the issue presented in this appeal is as follows: In light of the 2005 amendment to Indiana Code section 30–5–9–2(b), does the common law presumption of undue

influence apply to a transaction where the principal takes action and the attorney in fact does not use the power of attorney but still benefits from the transaction? This presents an issue of first impression.

At Scott's request, the trial court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage–MTI, Inc.,* 726 N.E.2d 1206, 1210 (Ind.2000), *reh'g denied.* In our review, we first consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen,* 671 N.E.2d 98, 102 (Ind.1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard,* 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* Although we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather, we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon,* 711 N.E.2d 1265, 1268 (Ind.1999).

■ We begin by addressing the common law presumption of undue influence. "Undue influence is defined as 'the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done' if such control had not

---

**1.** Citing Indiana Appellate Rule 15(C)(2)(b), Scott argues that because the Appellants' Case Summary filed in this case does not list Angela, she is "left out" of this appeal. Scott's Br. p. 2. However, according to the controlling language of Appellate Rule 17(A), "A party of record in the trial court ... shall be a party on appeal." Thus, Angela is a party in this appeal.

been exercised.'" *Trent v. Nat'l City Bank of Ind.*, 918 N.E.2d 646 (Ind.Ct. App., 2009) (quoting *Nichols v. Estate of Tyler*, 910 N.E.2d 221, 228 (Ind.Ct.App. 2009)). Indiana recognizes certain legal and domestic relationships that raise a presumption of trust or confidence as to the subordinate party on the one hand and a corresponding influence as to the dominant party on the other. *Hamilton v. Hamilton*, 858 N.E.2d 1032, 1036 (Ind. Ct.App.2006), *reh'g denied, trans. denied.* When transactions occur between a dominant and subordinate party which benefit the dominant party, the law imposes a presumption that the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent, and thus void. *Nichols*, 910 N.E.2d at 229. To rebut the presumption of undue influence, a dominant party must demonstrate to the trial court by clear and unequivocal proof that the transaction in question was made at arm's length and is therefore valid. *Id.*

■ Here, Stephen executed a power of attorney in 2005 designating his son Scott as his attorney in fact. A power of attorney creates a fiduciary relationship between a principal and his agent, or attorney in fact. *Hamilton*, 858 N.E.2d at 1036. As the three complaining children point out, it is true that there is Indiana law providing that a principal-agent relationship establishes a presumption of undue influence. *See Nichols*, 910 N.E.2d at 229 ("Nichols does not dispute the fact that as Tyler's Attorney in Fact, he owed Tyler a fiduciary duty, and that therefore, under Indiana law, a presumption of undue influence as to the property transfer in 2005 arose."). However, *Nichols* does not address the presumption of undue influence in light of the 2005 amendment to Indiana Code section 30–5–9–2(b), and therefore that case is not controlling. As such, we turn to Indiana Code section 30–5–9–2, which provides:

(a) An attorney in fact who acts with due care for the benefit of the principal is not liable or limited only because the attorney in fact:

  (1) also benefits from the act;

  (2) has individual or conflicting interests in relation to the property, care, or affairs of the principal; or

  (3) acts in a different manner with respect to the principal's and the attorney in fact's individual interests.

(b) A gift, bequest, transfer, or transaction is not presumed to be valid or invalid if the gift, bequest, transfer, or transaction:

  (1) is:

    (A) made by the principal taking action; and

    (B) not made by an attorney in fact acting for the principal under a power of attorney; and

  (2) benefits the principal's attorney in fact.

The 2005 amendment to Section 30–5–9–2 added subsection (b). P–L 238–2005, Sec. 52. It is Scott's and Monterey Bank's position that subsection (b) abrogates the common law presumption of undue influence regarding certain transactions benefiting an attorney in fact. We have located only one case addressing Section 30–5–9–2 since it was first enacted in 1991, *see Hudson v. Davis*, 797 N.E.2d 277, 286 n. 5 (Ind.Ct.App.2003), *reh'g denied, trans. denied*, and no cases addressing the statute after its amendment in 2005. However, *Henry's Indiana Probate Law and Practice* provides guidance on this very issue:

Effective July 1, 2005, changes to the Power of Attorney Act under Ind.Code Section 30–5–9–2 ostensibly abrogated the common law presumption of undue influence with respect to certain transactions benefiting an attorney-in-fact. The *Wade* decision [*In re Estate of*

*Wade,* 768 N.E.2d 957 (Ind.Ct.App. 2002), *trans. denied* ] confirmed existing Indiana law that a presumption of fraud attaches to transactions entered into during the existence of a fiduciary relationship, regardless of whether the fiduciary actually used his fiduciary powers to complete the transactions. This presumption applied to all transactions entered into during the fiduciary relationship, including wills, trusts, life insurance, annuities, and all inter vivos transfers of property, with the exception of accounts subject to the Non–Probate Transfer Act. With the enactment of Ind.Code Section 30–5–9–2, however, the common law, at least with respect to certain transactions benefitting an attorney-in-fact has been abrogated. A presumption of undue influence is now conditioned upon the attorney-in-fact's actual use of the power of attorney to effect the questioned transaction for his benefit.

\* \* \* \* \* \*

The current statute frees the benefiting attorney-in-fact from a presumption of undue influence as long as the power of attorney is unused in the questioned transaction. Presumably, the presumption may be raised through proof of a confidential or fiduciary relationship independent of the power of attorney but, standing alone, the principal/agent relationship under a power of attorney carries with it no presumption of validity or invalidity respecting a transaction benefiting the attorney-in-fact.

4 Daniel R. Gordon et al., *Henry's Indiana Probate Law and Practice* § 30.18 at 160.1–160.2 (2007) (footnotes omitted).

■ We agree with Scott, Monterey Bank, and *Henry's* that Section 30–5–9–2(b) indeed abrogates the common law presumption of undue influence with respect to certain transactions benefiting an attorney in fact. A presumption of undue influence is now conditioned upon the attorney in fact's actual use of the power of attorney to effect the questioned transaction for his or her benefit. The benefiting attorney in fact is freed from the presumption of undue influence so long as the power of attorney is unused in the questioned transaction. We now proceed to the facts of this case.

The trial court found that the power of attorney was unused in this transaction, *see* Appellants' App. p. 12 (Paragraph No. 9), and the three complaining children do not argue on appeal that such a finding is clearly erroneous.[2] It is also uncontested that the attorney in fact—Scott—benefited from this transaction. The only statutory element remaining is whether the principal—Stephen—took action. The three complaining children argue that because Scott took the majority of the action, such as using his own lawyer to draft the contracts and bringing the contracts to the hospital, Stephen's act of signing the contracts does not constitute "taking action"

---

2.  The three complaining children do, however, argue on appeal that "[t]o the extent that the court intended a negative finding on the existence of a fiduciary relationship between Scott and Stephen, such a finding is clearly erroneous." Appellants' Br. p. 18. Whether a fiduciary relationship existed is not the same as whether the power of attorney was used in the execution of the contracts.

The three complaining children also argue in their reply brief that Scott may have, in fact, used the power of attorney by having his own attorney draft the contracts. *See* Appellants' Reply Br. p. 6 n. 1. Despite this assertion in their brief, the three complaining children do not explicitly challenge the trial court's finding that Scott never acted as an attorney in fact for Stephen as clearly erroneous. We therefore defer to the trial court's finding of fact.

under the statute. However, as the trial court found in Paragraph No. 11, Stephen did more than just sign the contracts. Stephen inquired into selling his farmland before his hospitalization. In the summer or fall of 2007, Stephen asked Community State Bank President Joseph Carlson about the current value of farm real estate because he wanted to sell some of his land, and Carlson told him $2500 to $3000 an acre. One of Stephen's friends, Jeff McWherter, testified that shortly before Stephen's death, he discussed selling some of his real estate and changing his will. Contrary to the three complaining children's suggestion, this is not a case where Stephen merely signed off on the contracts and did not know the consequences of his actions because Scott was the orchestrator of the deal. Stephen took action pursuant to Indiana Code section 30–5–9–2(b). Accordingly, the common law presumption of undue influence does not apply to this case.

■ This does not mean that the three complaining children are left without a means of establishing undue influence. When the common law presumption of undue influence does not apply, plaintiffs can establish undue influence by showing the imposition of power by one party to deprive the other party of the exercise of free will. *See Trent*, 918 N.E.2d at 651-52. The trial court made several findings on this point, specifically observing that Stephen was "rational in spite of being down in the dumps and knowing his days were numbered. He was characterized as one to make up his own mind, to do his own thing, knowing his own mind, being strong willed, and not subject to being bullied or pushed." Appellants' App. p. 12. As noted above, the trial court also found that Stephen, within the relative time frame, independently inquired into the valuation of his farmland and commented on selling his land and changing his will. Finally, the court found that Stephen was aware and

alert while hospitalized. We find that the evidence supports these findings and that the findings support the trial court's judgment that Stephen acted under his own free will in executing the contracts selling approximately 150 acres of his farmland to Scott and buying Scott's house and putting the deed to the house in Gregory's name. We therefore affirm the trial court's grant of Monterey Bank's petition for completion of contracts.

Affirmed.

RILEY, J., and CRONE, J., concur.